Roane J.
There are some points in this cause, which are not controverted by either side. It is admitted, that upon the principles of the common law, a chose in action is not assignable; that is, the assignment does not give to the assignee a right to maintain an action in his own name.
It is also conceded, that in England the assignee of a bond takes it charged with every species of equity which was attached to it in the hands of the obligee. If a different principle prevail in this country, it must *317 grow out of the Acts of Assembly, which authorised the assignment of bonds. The Acts of 1730 and , 1748, upon this subject, are precisely the same as to the present question. I should have been glad to have seen the Act of 1705, but I have not been able to meet with it. This case depends upon the just construction of the Act of 1748. The intention of it was to alter the common law, so far as it prevented bonds from being assigned, and to give to the assignee a right to sue in his own name, in the same manner as the obligee might have done.
It was not intended to abridge the rights of the obligor, or to enlarge those of the assignee, beyond that of suing in his own name; and since it is clear, that prior to this law, an original equity attached to the bond, followed it into the hands of the assignee, this law does not expressly, nor by implication, destroy that principle. Notes of hand are now assignable in England, and it is admitted that the assignee is discharged of any equity which existed against the assignor, unless the note was given for an usurious, or for a gaming consideration.
The reason of this, is not that the principle attached to them is a legal consequence of their being made assignable, but because this rule for commercialpurposes applied to bills of exchange, and the Statute of Ann, declaring notes assignable, in like manner as bills of exchange, showed an intention, as it was supposed, to render the former as highly negotiable, and as current in internal as the latter was in external commerce. The Act of our Assembly embraces equally the subject of bonds and notes, but contains no expressions tending to induce a belief, that the making them assignable, was intended for purposes of commerce. The design certainly was, to make them transferable to a certain extent; the provision points out the limits of their negotiability, and fixes a strong mark of distinction between them and bills of exchange. As to the latter, they were always assignable, and the indorsement transferred a legal right to the indorsee. They did not owe this quality to statutary provisions, *318 and of course they continued within that principle , which-had attached to them, and of which they were not deprived by any Statute.
Lord Mansfield, lays it down in the case of Peacock v. Rhodes, Dougl. 636, “ that the holder of. a bill of exchange, or promissory note, is not to be considered in the light of an assignee of the payee. An assignee must take the thing assigned, subject to all the equity to which the original party was subject: if this rule applied to bills and promissory note.-, it would stop their currency. So in Cunningham's Law of Bills of Exchange, p. 65, the Chancellor refused to relieve against the assignee of a hill, “ because it would tend to destroy trade, which is carried on every where by bills of exchange, and he would not lessen an honest creditor’s security.” And we are informed by Domat, 131, Tit. 16, § 4, p. 231, that the covenant which passes between the person who gives the money, and him who undertakes to remit it to another place, hath in it some particular characters which distinguish it from other kinds of covenants, that seem to have some resemblance to it.
It is therefore, not because the indorsee is an assignee of the legal right to such bills and promissory notes, that the equity is barred by the indorsement, but because of their quality as a currency, and from the necessity of adopting such a principle for the convenience of trade and commerce with respect to such ; currency. But bonds are not to be considered as a '¡currency, and within the reason of the principle laid down in Peacock v.Rhodes, for that principle is founded uponcommercial considerations altogether,and notupon a distinction between legal and equitable assignments.
With respect to the proviso in the Act of 1748, it contemplates legal discounts only. The words, “ the plaintiff shall allow all discounts which the defendant can prove,” were meant to extend those discounts beyond the credits which might be indorsed on the bond; and the latter words, “before notice of such assignment was given to the defendant,” were meant to restrain the discounts to such as existed prior to *319 notice of the assignment. This enlarging and restraining proviso was necessary, in order to express dearly the meaning of the Legislature j but neither the proviso, nor any other part of this Act, was intended to extend to, or to abridge equitable discounts, which were not in the contemplation of the Legislature who made this law.
The inconvenience which it is apprehended will result from rejecting the application of the principle contended for, is certainly not real, or if it be, it was not so considered by the Legislature. The assignee, it is admitted, takes the bond at his peril, so far at least as the possible claim of the obligor to discounts ma}[1], extend. If he choose not to encounter this risk, or to repose entire confidence in the obligee, lie must inquire of the obligor, and from him obtain' information, respecting (at least) this part of the subject. With the same convenience, may the inquiry extend to any equitable objections attached to the bond. The two cases are precisely within the same reason, and I can discover no principle of policy or justice which should so widely distinguish them. The assignee of a note given by an infant, feme covert, or for a gaming, or usurious consideration, does not take it discharged of those objections, but the contrary. In those cases, as well as in respect of discounts, he must take care what he purchases; he acts at his peril, and must therefore act with caution. For what reason, then, shall an equity, originally incorporated with the bond, and which should destroy its obligation, be discharged in the hands of an assignee ? The provision of this Act has long governed the assignmentof bonds, and it is but of late years that the existence of such a principle as has been contended for in this cause has been thought of as applicable to bonds and notes. This consideration, though it would not direct, has much weight in confirming the opinion which I clearly entertain upon this subject. The appellee may suffer in consequence of it; but this is preferable to the establishment of a principle, which may produce great public mischief and injustice.
*320 Although I am clear in the opinion, that an equity existing against a bond, is not lost or extinguished by assignment for valuable consideration and without notice,- yet it may be lost by length of time or other circumstances. In this case however it does not appear when the deception practised by Anderson was found out by Norton, or that Norton delayed an unreasonable length of time in coming forward to assert - his equity. It is true, that his interest in the goods sold by Harris is not established in the proof, but the ground of the Chancellor’s decree being wrong, it must be reversed, and the cause remanded for further proceedings, so as to let in Mr. Norton to the proof of his equity. The decree, so far as it respects the order on Nicholas, with reference to the present appellee, I think is right.
Carrington J. — To consider this case upon general principles ; the question is, whether an equity, originally attached to a bond, follows it into the hands of an assignee without notice. In England, notes of hand were not assignable, until the 3d and 4th ,of Queen Ann, so as to enable the assignee to bring a suit at law in his own name. Courts of Equity were of course resorted to, where the maker of the note was not precluded from setting up any equitable defence which he might have. Frequent attempts were made by the bankers and traders to bring them within the custom of merchants, and to place them upon the same footing of negotiability with bills of exchange. But the judges still considered them merely as evidences of debt. At length, the Statute was procured, conformably with the wishes of the trading part of the community, making them assignable, in like manner as bills of exchange. The likeness thus strongly sanctioned by Legislative authority, produced similar decisions in cases where their negotiability were concerned.
But no efforts were made in favour of bonds, and they remain in the same situation in England, as they stood at common law.
*321 This country was then a part of the British Empire, and our Legislature assimilated its laws to those of the mother country, so far as our local situation and state of society authorised it. In 1705, shortly after the English Statute passed respecting notes of hand, the Assembly passed a law, authorising the asssignment of bonds and notes. This law, I cannot meet with, .but it was repealed by proclamation in 1730, and in the same year, another law was enacted, exactly similar to the Act of 1748. With the English Statute before their eyes, the Legislature did not choose to adopt it altogether, or to introduce into it a principle which should defeat the equity of the obligor, as it was secured to him at common law. Those expressions in the Statute which assimilated notes to bills of exchange were omitted in our law, and, in the room of them, others were introduced, which established an opposing principle. The negotiability of bonds and notes was qualified and restricted within bounds consistent with the commercial station of this country. There was no necessity for exalting those kinds of paper to the high ground on which the commercial world had placed bills of exchange, and the whole complexion of the latv shews, that it. was intended to be avoided. The doctrine which has been stated and relied upon, as applicable to foreign bills of exchange, is consequently inapplicable to the present discussion. These considerations have produced conclusions in the public mind, as to the construction of the law in question, the very reverse of what has been contended for by the counsel for the appellee. I should be unwilling tb unsettle these long formed opinions, unless the expressions of the law rendered it absolutely necessary.
Tha't a bond fraudulent and void in its creation, cannot be cleansed of its impurity, and rendered valid by assignment, is settled by- the case of Turton v. Benson, and has uniformly been so decided in the Courts of this country. Ño man can, by the mere act of assignment, transfer a greater interest than he. holds ; dispose of an interest where he has nothing, *322 or make good and valid, that which was originally vicious and void. In this .enlightened age, former decisions are rejected, and a new mode of attaining justice is discovered. But is it true, that the means are adequate to the object ? It is urged, as a reason for the rejection of former opinions upon this subject, that they tended to impose deceptions upon the public, and to cramp commerce, by destroying the negotiability of bonds and notes. As it strikes me, they rather tend to prevent, than to countenance those frauds, and if the other consequences will follow, it is preferable to sacrificing a majority of the public, to the avarice and injustice of a few. But I cannot perceive, how commerce, or that sort of it which is most useful to society, can be injured. That their negotiability will be restrained I admit, but they will answer the purposes for which the law intended them, by. facilitating the collection of debts, and thereby affording a convenient, and desirable accommodation to the people of this country.
The case now under consideration comes fully within those principles which seem to me correct. Norton and Anderson were concerned together in trade, and upon a settlement of accounts, Norton claimed a credit for the proceeds of a quantity of goods in the hands of Harris. But Harris assuring him that he had received no part of those proceeds, Norton, unsuspicious of the truth, gave his bond for the balance as it stood. Rose, it is admitted, was a fair bona fide purchaser of the bond. He is chargeable only with neglect; he might and ought to have satisfied himself that the debt was justly due before he received it. If, upon an inquiry, Norton had assented to the payment, or acknowledged he had no objections to it, this would have deprived him of his equity against Rose. It was easy for any person wishing to take an assignment of the bond, to make the inquiry ; they would know at once, where to make the application. On the other hand, Norton could not give a special notice to the person who was about to *323 obtain it, and the public papers would afford a very uncertain channel of information.
Upon the whole, I am clear that the decree is erroneous and ought to be reversed.
Lyons J. — This has been truly said to be a cause of considerable importance, on account of the precedent to be established. In order to discover the legislative intention when the Act of 1730, (of which that of 1748 is an exact copy, as to this question,) was passed, and to comprehend more clearly the consequences of the construction contended for by the appellee, I shall consider this case as if it had been to be decided upon at that time. If Norton had given this bond before assignments were sanctioned by legislative authority, it is admitted on all hands, that his equity would have followed the bond into the hands of an assignee. If so, is it possible that the Legislature could have meditated so much injustice, as to ex-, elude him from setting up an objection to the debtj which, but for the law, he might have made ? Could; it mean to protect fraud, and to give validity to an instrument which was originally void and founded in deception ? Whatever would then have been the construction of the law, must be the construction of it at this day. I mention this to shew that the Legislature, by making bonds assignable, did not thereby mean to deprive the obligors of any equitable objections, which they might have to them. Until this Act passed, bonds were not assignable. Bills of exchange could not answer the purposes of internal negotiation, between the planters and the merchants; the former, from their situation, were under a necessity of having credit from the latter, and to secure this, it w’as deemed proper to make bonds assignable, by which means, the factors, who often took them in their own names, were enabled to pass them away in the purchase of commodities, or might, when necessary, transfer them over to their principals. This history of bonds will evince, that as there was no necessity, so it never could have been the legislative intention to give to *324 them all the high privileges attached to bills of ex- - change, and particularly that which has been contended for by the appellee. Independent of this, the law, upon the face of it, repels a construction, calculated to deprive the obligor of his equitable objections. It saves to him the right of opposing the claim by all Just discounts which he can make, and consequently could not mean to deprive him of an equity, strong enough to invalidate the whole claim. The law, so far from being designed to grant favours to the assignee, is calculated to protect the obligor; the .former, is obliged to admit all discounts against the obligee, and at his peril to give notice of the assignment, under the penalty of being bound by payments made, after the obligee has parted with his right to receive them.
The accuracy of the principle laid down by the appellee’s counsel is not questioned; its application to this case is. For since it is admitted, that if the law had not permitted the assignment of bonds, an equity existing against the'obligee would have accompanied the bond into the hands of an assignee, the single inquiry which remains is, does the law take away this ! right, previously possessed by the obligor ? I have endeavoured to shew, that so far from doing this, the law itself displays a careful attention to the rights and interest of the obligor.
The arguments which were used to assimilate this to the case of a bill of exchange and promissory note, are totally without foundation. The reason of the law, as applicable to those cases, is not founded upon the principle stated by the counsel for the appellee, but upon considerations altogether of a commercial nature.
Upon the whole, I concur in opinion with the other Judges.
The opinion and decree of the Court, was entered as follows:
“ The Court is of opinion, that an assignee of a bond or obligation, takes the same, subject to all the *325 equity of the obligor, and that the appellant ought to t'e allowed to set off and discount against the debt claimed by the appellee as assignee of George Anderson, the other defendant in the decree named, any equitable demand respecting the said debt, which' he had a right to claim from the said George Anderson, the original obligee.” ' Decree reversed with costs, and the caufce remanded to the High Court of Chancery for further proceedings to be had therein, according to the principles of this decree.([1])

(1) Woodson et al v. Barrett & Co. Goodall v. Stuart, 2 Hen. & Munf. 80.105.113. Mayo v. Giles’ Adm. 1 Munf. 533. Stocktons. Cook, 3 Munf. 68.